DORSEY & WHITNEY LLP
Bruce R. Ewing, Esq. (BE-0724)
250 Park Avenue
New York, NY 10177
(212) 415-9200



Attorneys for Plaintiff
Toy Play, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Judge Pauley

-----------------------------------------------------------X

TOY PLAY, LLC,

                 Plaintiff,

- against -

GEOMETIX INTERNATIONAL, LLC,

                 Defendant.

-----------------------------------------------------------X

**07** 7 Civ. **CV 11226**

**COMPLAINT**

    Plaintiff Toy Play, LLC, by and through its undersigned counsel, as and for its Complaint

against defendant Geometix International, LLC, alleges as follows:

### Parties, Jurisdiction and Venue

    1.    Plaintiff Toy Play, LLC ("Toy Play") is a New York limited liability company

with its principal place of business in New York, New York.

    2.    Upon information and belief, defendant Geometix International, LLC

("Geometix") is a Connecticut corporation with its principal place of business in Brookfield,

Connecticut whose President is or was Warren Fentress.

    3.    This is a civil action for declaratory relief under the Declaratory Judgment Act, 28

U.S.C. §§ 2201 *et seq.* An actual justiciable controversy exists between Toy Play and Geometix

that warrants the issuance of a judgment declaring that no contractual relationship was ever

formed between the parties, such that Toy Play is not liable to Geometix on any claim for breach of contract and is not obliged to arbitrate such claim.

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332, in that the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000.

5.      Upon information and belief, this Court has personal jurisdiction over defendant pursuant to New York CPLR §§ 301 and 302.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (c).

## THE CIRCUMSTANCES GIVING RISE TO THIS ACTION

6.      Toy Play is an entity formed for the purpose of selling, marketing and distributing toys.

7.      In early 2004, Toy Play and Geometix discussed a potential business relationship, pursuant to which Geometix would license certain intellectual property – primarily consisting of technology subject to a then-pending patent application and a then registered trademark – to Toy Play for the purpose of selling, marketing, manufacturing and distributing toys.

8.      Geometix and Toy Play drafted an agreement memorializing the terms under which they proposed to pursue their contemplated business arrangement.  A copy of the agreement they drafted as of April 5, 2004 is attached hereto as Exhibit A (the "Proposed Agreement").

9.      The Proposed Agreement between the parties never became effective for a number of reasons, including but not limited to developments that occurred contemporaneously with the execution of the Proposed Agreement by Toy Play.

10.     On April 5, 2004, an authorized agent of Toy Play executed the Proposed Agreement and forwarded his signature page by facsimile to counsel for Geometix.

11.     Later on April 5, 2004, at approximately 9:39 p.m., Geometix, by Warren Fentress, advised Toy Play that it was unwilling and unable to abide by paragraph 8 of the Proposed Agreement concerning the policies of liability insurance each party would have been obliged to procure "simultaneously with the execution of this Agreement." This "insurance requirement" was a material term of the Proposed Agreement and an essential part of the consideration for which Toy Play bargained. An email from Geometix's President Fentress to Toy Play indicating that paragraph 8 of the Proposed Agreement was unacceptable as of April 5, 2004 is attached hereto as Exhibit B.

12.     Following the transmission of the email attached as Exhibit B, the parties were unable to reach agreement on, *inter alia*, the "insurance requirement" for which paragraph 8 in the Proposed Agreement provided. All discussions among the parties therefore terminated for this and other reasons shortly thereafter.

13.     After April 5, 2004, neither Toy Play nor Geometix engaged in any course of conduct consistent with the terms of the Proposed Agreement. Upon information and belief, neither party ever performed any of the obligations required of them under the Proposed Agreement because they understood that the Proposed Agreement had never taken effect.

14.     Upon information and belief, between approximately May 2004 and November 8, 2007, there were no communications between Toy Play and Geometix. Then, on November 8, 2007, an attorney representing Geometix transmitted a letter to Toy Play asserting that Toy Play had breached the Proposed Agreement that had never taken effect in 2004 and caused damages to Geometix in excess of $20 million. Geometix's counsel further threatened to initiate an

3

arbitration under paragraph 10.3 of the Proposed Agreement in the event the matter could not be resolved. A copy of the November 8, 2007 correspondence from Geometix's counsel to Toy Play is attached as Exhibit C.

15.    In response to this correspondence, Toy Play requested a copy of the agreement that it was accused of breaching, as it had no copy of any contract signed by Geometix in its files. In response, on November 21, 2007, Geometix's counsel forwarded a copy of the Proposed Agreement, with a purported signature from Fentress dated April 5, 2004, the same date as the email from Fentress attached as Exhibit B. This was the first time Toy Play ever saw a copy of the Proposed Agreement signed by Geometix.

16.    Given the statements set forth in Fentress' email of April 5, 2004 concerning the "insurance requirement" in the Proposed Agreement that Geometix was no longer willing to honor as of that date and the total absence of communications between the parties after April 2004, Toy Play does not believe that Fentress signed the Proposed Agreement on April 5, 2004, the date that appears under Fentress' signature on the Proposed Agreement.

17.    Efforts by counsel for the parties to resolve this dispute through negotiation ended acrimoniously on December 10, 2007. During that conversation, Geometix's counsel reaffirmed his client's intention to commence an arbitration over this dispute.

18.    Thus, as of the date of this filing, Geometix is free to act on its previously stated intention to invoke an arbitration clause against Toy Play under a draft agreement that was never of any legal effect and that the parties never recognized as such. Toy Play is therefore under a reasonable apprehension that it will face imminent legal action from Geometix in a forum in which it never agreed to be sued seeking the recovery of damages under an alleged contract that

never became legally binding or effective. Thus, there is at present an actual controversy between the parties that threatens to seriously injure and damage Toy Play.

## COUNT I

### Declaratory Judgment

19.     Toy Play repeats and realleges each and every allegation set forth in paragraphs 1 through 18 hereof as if fully set forth herein.

20.     Geometix asserts that the Proposed Agreement is a binding, legally enforceable agreement under which Toy Play is liable for amounts in excess of $20 million on claims that must be arbitrated.

21.     In fact, the Proposed Agreement never took effect, and Toy Play never became bound to any of its provisions, including the arbitration provisions of paragraph 10.3. Phrased another way, there is and was no agreement to arbitrate anything because the agreement out of which Geometix's claims arise never became legally effective.

22.     Accordingly, Toy Play is entitled to a judgment declaring that the Proposed Agreement is not and never has been of any legal effect, and that as a consequence thereof: (i) Toy Play is not obliged to arbitrate any of Geometix's claims; and (ii) Geometix has no claim for breach of the Proposed Agreement.

WHEREFORE, Toy Play prays that this Court:

1.     Issue a declaratory judgment that the Proposed Agreement is not and never has been of any legal effect, and that as a consequence thereof: (i) Toy Play is not obliged to arbitrate any of Geometix's claims; and (ii) Geometix has no claim for breach of the Proposed Agreement.

    2.    Award Toy Play such other and further relief as the Court deems just and proper, including such injunctive relief as may be necessary to bar the prosecution of any arbitration Geometix might commence against Toy Play.

Dated:    New York, New York             DORSEY & WHITNEY LLP
            December 13, 2007

By: _____
        Bruce R. Ewing (BE-0724)
        250 Park Avenue
        New York, New York 10177
        (212) 415-9200

        Attorneys for Plaintiff
        Toy Play LLC

# EXHIBIT A

## LICENSE AGREEMENT

THIS LICENSE AGREEMENT (the "Agreement") is made and entered into as of the later date of execution below (the "Effective Date"), by and between GEOMETIX INTERNATIONAL LLC, a limited liability company having an address at 101 Heatherwood Drive, Brookfield, Connecticut 06804 (hereinafter the "Licensor") and TOY PLAY, LLC a New York limited liability company having its principal office at 1 East 33rd Street, New York, New York 10016 (hereinafter the "Licensee").

### R E C I T A L S :

WHEREAS, Licensor owns all right, title and interest in and to the patent entitled "System of Educational Magnetic Blocks," Patent Pending No. 10/678,764 (hereinafter the "Patent") and has the unrestricted right to grant a license to a third party in connection with the manufacture, distribution, sale, advertising and promotion of all products utilizing the Patent; and

WHEREAS, Licensor owns all right, title and interest in and to the pending trademark entitled "MagneBlocks" U.S. registration no. 78307752 (hereinafter the "Trademark") and has the unrestricted right to grant a license to a third party in connection with the manufacture, distribution, sale, advertising and promotion of all products utilizing the Trademark; and

WHEREAS, Licensee wishes to be granted an exclusive license to use the Patent and the Trademark in conjunction with the Licensed Products throughout the Territory; and

WHEREAS, Licensor is willing to grant to Licensee a license under the terms and conditions specifically set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants, undertakings, and premises contained herein, and other good and valuable consideration, the receipt of which the parties hereby acknowledge, it is hereby agreed to as follows:

### 1. Definitions

1.1     **Licensed Products**: shall be defined as all children's building blocks utilizing magnetic pulls to hold the pieces together, which contain the Patent or bear any other Intellectual Property (as hereinafter defined) owned by Licensor, as such may be modified or improved from time to time.

1.2     **Territory**: shall initially consist of the United States, its territories, possessions and Puerto Rico, Mexico and Canada, and, subject to Section 2.1(b) herein shall be expanded to include the European Territory defined as the European Union, Australia, New Zealand and South Africa.

    1.3    **Intellectual Property**: shall consist of the Patent, the Trademark and all trademarks, tradenames, trade secrets, trade dress and copyrights owned by the Licensor which are associated in any way with the Patent, including, without limitation those rights set forth in Exhibit A.

## 2. Grant

    2.1    **License Grant:**

        (a) Licensor hereby grants to Licensee and Licensee hereby accepts the exclusive right and license, to use and to sublicense the use of the Patent throughout the Territory during the Licensed Term of this Agreement in connection with the advertising, promotion, sales and distribution and manufacturing, subject to Section 2.3, of the Licensed Products. In connection therewith, Licensee shall also have the unrestricted right throughout the Licensed Term to utilize throughout the Territory all associated Intellectual Property owned by Licensor in connection with the Licensed Products, and the packaging and marketing thereof.

        (b)    Licensee shall have the exclusive right to sell and distribute the Licensed Products in all channels of distribution throughout the Territory as determined in the sole discretion of Licensee, with the exception of the Internet, which will be non-exclusive. Any pricing by the Licensor must be no less than the retail pricing set by the Licensee. Without limiting the foregoing, the Licensee shall also have the exclusive right to sell or distribute the Licensed Products through all retail channels by direct marketing methods, including catalogue and mail order, home shopping shows, and direct mail within the Territory. In addition, if the cumulative gross sales of the Licensed Products exceed Ten Million ($10,000,000) Dollars (at invoiced wholesale price) by October 31, 2007, the Territory shall be expanded to include the European Territory, which shall be incorporated at such time into the "Territory." This Territory expansion will be contingent upon (i) assumption or assignment of any then-existing European contracts, (ii) a minimum sales guarantee to be determined by June 2005, (iii) an advance against royalties on sales with the European Territory of $50,000.00 USD payable to Licensee on or before December 1, 2007, and (iv) payment of royalties to Licensee at the same terms as the existing schedule. Prior to October 31, 2007, Licensor shall not grant any rights with respect to the sale and distribution of the Licensed Products throughout Europe, without the prior written consent of the Licensee, which shall not be unreasonably withheld.

    2.2    **Licensor's Restrictions and Cooperation:** In connection with the exclusive grant hereunder, Licensor hereby agrees that it shall not in any way utilize the Patent (or any confusingly similar Patent) nor grant to any third party the right to utilize the Patent (or any confusingly similar Patent) on or in connection with any products related to the Licensed Products throughout the Territory at any time during the Licensed Term; nor shall Licensor grant to any third party the right to utilize the Intellectual Property on or in connection with any products similar to the Licensed Products at any time during the Licensed Term.

    2.3    **Intellectual Property:** The Licensee shall have the right to create logos, tradenames, designs and trademarks to be used in connection with the Licensed Products and to direct manufacturers to incorporate such logos, tradenames, designs and trademarks on the

Licensed Products and all packaging and labeling in connection with the Licensed Products. All such intellectual property, including without limitation, logos, tradenames, designs, trademarks and copyrights shall be owned solely by the Licensee, and Licensor acknowledges that it shall not attack or contest the validity of such intellectual property or Licensee's rights in such intellectual property and Licensor shall not independently utilize any of such intellectual property (or any similar mails, designs, logos or creations) without the express prior written consent of Licensee. In the event any of such intellectual property is vested in the Licensor, Licensor hereby appoints Licensee as its attorney-in-fact to effectuate any transfers or assignments in accordance with this Section 2.3.

2.4    **Manufacturing Rights.**   The Licensee shall have the right to manufacture Licensed Products provided that, (i) within twenty-four months of the Effective Date, it shall have purchased 1,000,000 SKU's of the product line existing as of the Effective Date, at wholesale prices from Double Grand, and (ii) if a second product line is introduced using pieces not commercially available at the Effective Date, the Licensee shall have purchased 1,000,000 SKUs of that new product line with twenty-four months of commercial availability of such product line; or, if Licensor approves in advance, in writing, manufacturing by the Licensee prior to such goals are met. Licensee agrees to purchase such SKUs from Double Grand subject to the following conditions: (i)(a) The price quoted by a manufacturer other than Double Grand (the "Other Manufacturer") is not more than twenty (20%) percent lower that the price quoted by Double Grand for substantially the same product, and (b) the quality of the products generally produced by the Other Manufacturer is substantially similar to the quality of the products produced by Double Grand; (ii) the quality of the merchandise produced by the Double Grand must be, in the Licensee's discretion, at least equal to the quality of merchandise generally sold by Licensee within the channels of distribution for which such item is being sold; (iii) Double Grand may not dispose of any of the Licensed Products in an unauthorized manner; (iv) Double Grand must, in Licensee's reasonable discretion, have sufficient manufacturing capabilities to manufacture the quantity of goods necessary to satisfy Licensee's order; (v) Double Grand may not sell products similar to the Licensed Products to any third party; and (vi) Double Grand must be in full compliance with all labor laws in the place of the manufacture of the Licensed Products and in no event, may Double Grand employ any people under the age of 16 or use prison labor. To the extent provided for in the preceding two sentences, the Licensee will have the right to manufacture or have manufactured the Licensed Products by any manufacturer, as soon as 1,000,000 SKUs of each product line has been, whether or not such twenty-four month periods have elapsed, provided that such the Licensee or any third-party manufacturer engaged by it shall agree to commercially reasonable terms to protect the interests of Licensor in any such molds.

### 3.  Term and Volume Sales Requirements

The term of this Agreement (the "Licensed Term") shall commence on the date hereof and shall extend until December 31, 2006 (the "Initial Term"). Licensee shall have the right to renew this Agreement for two (2) additional three-year  (3 - year) periods, provided that (i) Net Sales as defined in Section 4.1(b) shall be no less than $5,000,000 USD through November 15, 2006; (ii) Net Sales for the period November 16, 2006 to November 15, 2009 shall be no less than $7,000,000 USD; and (iii) Net Sales for the period November 16, 2010 to November 15, 2012

shall be no less than $9,000,000. If these minimum sales goals are achieved, the agreement will automatically renew for the next renewal term unless the Licensee provides to Licensor written notice of its intention not to renew no less than 60 days prior to the end of the Initial Term or any subsequent renewal term. If the foregoing minimum volume requirements have not been met, Licensor may in its sole discretion renew the Agreement, including on a non-exclusive basis, subject to Licensor's right to terminate, as set forth in Section 7.2.

## 4. Royalties

4.1    **Royalties:** (a) In consideration of the license granted herein, Licensee shall pay to Licensor a royalty equal to ten (10%) percent of Net Sales of the Licensed Products (the "Earned Royalty") which shall be payable within thirty (30) days after the end of each calendar quarter during the Licensed Term (the "Quarterly Period").

(b)    The term "Net Sales" shall mean the gross invoice price charged for the Licensed Products sold by Licensee less all trade discounts, returns and chargebacks for damaged or defective units (not to exceed 10% of any shipment).

4.2    **Advance:** Upon the execution of this Agreement, Licensee shall pay to Licensor a non-refundable advance payment of One Hundred Five Thousand ($105,000) Dollars, which shall be applied against all royalties due to Licensor.

4.3    **Reports and Statements:** Concurrent with the payment of the Earned Royalty, Licensee shall submit to Licensor a written report relating to and including a calculation of the Net Sales made by Licensee during said Quarterly Period.

4.4    **Inspection of Books and Records:** Upon five (5) days written notice to Licensee and during regular business hours, Licensee shall permit Licensor and its duly authorized representatives, no more than two times during any twelve (12) month period, to inspect all books and records of Licensee relating to this Agreement. Licensee agrees to fully cooperate with such inspector, and in the event that any shortfall is discovered by Licensor, Licensee shall reimburse Licensor within thirty (30) days after the parties' resolution as to the amount of the shortfall. In the event that any payments owed by Licensee to Licensor are not paid when due, interest shall accrue on such amount at a rate of twelve (12%) percent per annum, commencing ten (10) days after written notice by Licensor to Licensee.

## 5. Patent

5.1    **Improvements:** Licensor shall use commercially reasonable efforts to enhance and further the Patent, and the technology underlying the Patent, and shall expend such amounts as are necessary for such purpose. All enhancements and improvements developed or created by or for Licensor in connection with the Licensed Products and/or the Patent shall be made available to Licensee at no additional cost to Licensee so that, at Licensee's sole option, such enhancements and improvements shall be incorporated into the Licensed Products in order that throughout the Licensed Term, Licensee shall always be entitled to the most current state-of

the art designs and technologies for the Licensed Products. All patents or letter patent issued on improvements to the Patent conceived or reduced to practice during the Licensed Term hereof shall be the exclusive property of Licensor, subject to Licensee's exclusive right to utilize such Patent pursuant to the terms of this license granted herein. Licensor shall promptly prepare, file and prosecute, at its own expense, patents and applications for letters patent in the United States and in all other countries in which Licensee is selling Licensed Products for all improvements made by Licensor during the Licensed Term, in which countries patents are pending or have issued. Licensor shall do all acts necessary for obtaining, sustaining, reissuing or extending Patents or letters patent based on the Patent, including all improvements and shall defend and give testimony and otherwise provide evidence in case of interference. In the event that Licensee elects not to incorporate such improvement or technology into the Licensed Products, Licensor shall not be permitted to license, or otherwise permit the use of, such technology or patent to any third party, without the prior written consent of the Licensee.

## 6. Representations and Warranties

6.1  **Licensee's Representations, Warranties and Covenants:**  In addition to and without limiting any of Licensee's other representations set forth throughout this Agreement, in any way, Licensee hereby represents, warrants and covenants that:

(a)  Licensee currently has and will continue to have throughout the Licensed Term and Sell-Off Period, the full right, power and authority to enter into this Agreement and to assume and perform all of its duties and obligations hereunder;

(b)  This Agreement has been duly and validly executed by Licensee and constitutes a valid and binding agreement of Licensee, enforceable against Licensee in accordance with its terms.

(c)  Licensee is duly organized, validly existing and in good standing under the laws of the state of New York and has all requisite power to own, lease and operate its properties and to carry on its business as now being contemplated by this Agreement.

6.2  **Licensor's Representations, Warranties and Covenants:**  In addition to and without limiting any of Licensor's other representations set forth throughout this Agreement, in any way, Licensor hereby represents, warrants and covenants that to the best of its knowledge:

(a)  Licensor is the owner of the Patent and the Intellectual Property with the sole and exclusive good and valid title to the Patent and the Intellectual Property, which are free and clear of any liens, charges or encumbrances of any kind whatsoever;

(b)  Licensor is the sole inventor and developer of the Patent and no other person or entity had or shall have any claim or ownership with respect to the Patent;

(c) Licensor has taken all necessary action to maintain the continued validity of the Patent and the Intellectual Property throughout the countries in the Territory in which patent registrations have been filed;

(d) There are no allegations or actions pending or threatened against the Patent and the Intellectual Property, which seeks to nullify, cancel or in any way invalidate the Patent or the Intellectual Property, and Licensor has not asserted any allegation, action or claim with respect to the Patent or the Intellectual Property;

(e) Licensor has not previously assigned, licensed, transferred, conveyed or otherwise encumbered its right, title and interest in the Patent or the Intellectual Property; and

(f) Licensor is solvent and is not currently or in the past subject to bankruptcy proceedings nor is it contemplated that Licensor will be subject bankruptcy proceedings in the future; and

(g) The design of the Licensed Products, when used for their intended purposes, will not cause harm to any person.

6.3     **Indemnifications:**

(a) Licensor hereby indemnifies and holds harmless Licensee and its officers, employees, customers, sublicensees and representatives (the "Licensee Indemnified Parties") from and against any and all such claims, actions, liabilities, losses, and damages (including, without limitation, costs and expenses and reasonable attorneys' fees and disbursements) from third parties arising from (i) the use by any or all of the Licensee Indemnified Parties of the Patent or any other Intellectual Property in accordance with the provisions of this Agreement and (ii) any breach by Licensor of any or all of its representations or warranties hereunder. These indemnifications shall survive expiration or termination of the Licensed Term. In the event of any claim of intellectual property infringement, Licensor may in its sole discretion (i) obtain rights from third parties or (ii) if no other commercially reasonable alternatives are available, terminate this Agreement, in whole or in part, provided however that the Licensee shall have the right but not the obligation to defend any such intellectual property infringement claim at its sole expense. The obligation to indemnify will be contingent upon the Licensee (i) providing Licensor with prompt written notice of any claim for which indemnification is sought; (ii) cooperating fully with Licensor at Licensor's expense; and (iii) allowing Licensor to control the defense and settlement of such claim. The Licensee may, at its own expense, assist in the defense if it so chooses.

(b) Licensee hereby indemnifies and holds harmless Licensor and its officers, employees, customers, sublicensees and representatives from and against any and all such claims, actions, liabilities, losses, and damages (including, without limitation, costs and expenses and reasonable attorneys' fees and disbursements) from third parties arising from (i) any liability arising from the manufacture of the Licensed Products in accordance with the provisions of this Agreement and (ii) any breach by Licensee of any or all of its representations or warranties

hereunder. These indemnifications shall survive expiration or termination of the Licensed Term. The obligation to indemnify will be contingent upon Licensor (i) providing the Licensee with prompt written notice of any claim for which indemnification is sought; (ii) cooperating fully with the Licensee at the Licensee's expense; and (iii) allowing the Licensee to control the defense and settlement of such claim. Licensor may, at its own expense, assist in the defense if it so chooses.

## 7. Termination

7.1    **Cessation of Agreement:** Subject to the continuing obligations arising from a breach hereof and those terms that survive cessation of this Agreement (including Licensee's right to sell-off as set forth in Section 7.3), this Agreement and all rights relevant thereto shall cease upon the earlier of termination, for whatever reason, or expiration and revert to Licensor who shall thereafter be free from any restriction whatsoever, to use and to license others to use the Patent in connection with the Licensed Products within the Territory.

7.2    **Termination Procedure:**

(a)    In the event either party breaches any of the terms and/or conditions or any of the representations and warranties contained in this Agreement, the other party shall have the right to terminate this Agreement by giving notice of termination to breaching party, provided however that the breaching party shall have thirty (30) days from its receipt of written notification in which to completely remedy said breach.

(b)    Upon the occurrence of any of the following, written notice of which is hereby required to be given to the Licensor, the Licensee shall have the option, but not the duty, to terminate this Agreement on written notice to other as of the earliest date on which any of the following events occur: (i) The filing of a petition by or against the Licensor under the United States Bankruptcy Act, as amended, or under the insolvency laws of any state, or in the event that the Licensor or a third party commences a proceeding or files a petition of similar import under another applicable bankruptcy or insolvency law in which the Licensor is the subject of such action and such action is not dismissed within 90 days thereafter; (ii) Licensor commits any act or offense involving moral turpitude under Federal, state or local laws or any act whatsoever, which may bring Licensee into dispute, scorn, contempt, scandal or ridicule.

(c)    Upon the occurrence of any of the following, written notice of which is hereby required to be given to the Licensee, the Licensor shall have the option, but not the duty, to terminate this Agreement on written notice to other as of the earliest date on which any of the following events occur: (i) The filing of a petition by or against the Licensee under the United States Bankruptcy Act, as amended, or under the insolvency laws of any state, or in the event that the Licensee or a third party commences a proceeding or files a petition of similar import under another applicable bankruptcy or insolvency law in which the Licensee is the subject of such action and such action is not dismissed within 90 days thereafter; (ii) Licensee commits any act or offense involving moral turpitude under Federal, state or local laws or any act whatsoever, which may bring Licensor into dispute, scorn, contempt, scandal, ridicule, or any art that will

shock, insult or offend the Licensor's industry or the public, (iii) if the cumulative Earned Royalty as of December 31, 2006 is less than Five Hundred Thousand ($500,000) Dollars; provided that in such an event, Licensee shall be permitted to pay Licensor the difference between $500,000 and the aggregate Earned Royalty paid or earned through the period ending December 31, 2006, and Licensor shall have no right to terminate this Agreement.

(d) In the event the Licensee is unable to meet the volume requirements stated in Section 3, and in the event that, notwithstanding such fact, Licensor has agreed to renew this Agreement, Licensor shall have the right, in its sole discretion, but not the obligation, to terminate any or all rights under this Agreement with thirty (30) days written notice to the Licensee.

7.3     **Continued Sales After Expiration or Termination:**  Subject to the conditions set forth herein, upon expiration of this Agreement or upon its termination for any reason, Licensee shall have a reasonable time on a non-exclusive basis, not to exceed six (6) months from the expiration or termination date of this Agreement, in which to dispose of its then existing inventory and work in process of Licensed Products (hereinafter referred to as the "Sell-Off Period") by selling and distributing such Licensed Products pursuant to the provisions of this Agreement.  Within thirty (30) days following the close of the Sell-Off Period, Licensee shall remit to Licensor all required Earned Royalties on such Net Sales.

## 8.  Insurance Requirement

(a)     Simultaneously with the execution of this Agreement, each of Licensor and Licensee shall promptly obtain and maintain in full force and effect at all times during the Licensed Term and for at least two (2) years thereafter, at its own cost and expense, liability insurance with respect to the Patent and any products to be constructed or developed incorporating the Patent in the amount of Two Million ($2,000,000.00) Dollars each of primary and umbrella coverage from one or more insurance companies, each with a Best's rating of "A" or better.  Such liability insurance shall cover any claims, demands, causes of action and damages, including reasonable attorneys' fees arising from any liability arising from Licensee's use of the Patent.   Such insurance policy shall:

(i)     provide for coverage resulting from claims reported after the policy period;

(ii)     name the other party hereto as an additional insured thereunder; and

(iii)     provide for at least thirty (30) days prior written notice to the party hereto of any cancellation, modification, surrender, or any other action that would affect the other party's status or benefits thereunder.

(b)     Each party shall promptly furnish or cause to be furnished to the other party evidence, in form and substance satisfactory to such party, of the maintenance and renewal

of the insurance required herein, including, but not limited to, copies of policies with applicable riders and endorsements, Certificates of Insurance, and Continuing Certificates of Insurance.

### 9. Marketing

9.1     Upon receipt of the aggregate of Five Million ($5,000,000) Dollars in gross sales, Licensee agrees to expend One Million ($1,000,000) Dollars over the twelve (12) month period for the advertising of the Licensed Products on television throughout the Licensed Territory. The content of such advertising campaign shall be in the sole discretion of the Licensee, provided the content shall be approved in advance in writing by Licensor, which approval shall not unreasonably be withheld. Licensor shall not have the right to advertise the Licensed Products in the Territory without the prior written consent of the Licensee, which consent shall not unreasonably be withheld. Licensor has the right to market and advertise the Licensed Products throughout Europe until such time as the Licensee shall obtain the exclusive rights to Europe, as provided for herein, at which time Licensor shall no longer advertise or market the Licensed Products in Europe.

9.2     Licensee shall display the Licensed Products at such trade shows as it shall deem reasonably necessary for the efficient promotion and sale of the Licensed Products.

9.3     Licensor agrees to be available, at Licensee's reasonable request, to advise, consult and work with Licensee in connection with the marketing and packaging of the Licensed Products and with respect to layout and design of the Licensed Products. It is understood that Licensor shall have final approval rights with respect to such matters, which approval shall not unreasonably be withheld.

### 10. Miscellaneous

10.1     **Limitation of Relationship**: Nothing contained herein shall be construed to place either party in the relationship of legal representative, partner, joint venturer, principal, or agent of the other, and neither party shall have the authority to obligate or bind the other.

10.2     **Notices**: Any notices to be given under this Agreement shall be in writing and shall for all purposes be deemed to be fully given by a party when sent by certified or registered mail, postage prepaid, return receipt requested, or reputable overnight carrier (signature required on receipt), to the other party at the respective address set forth in the beginning of this Agreement. Copies of all notices to Licensee shall be concurrently sent to: Wachtel & Masyr, LLP, 110 East 59th Street, New York, NY 10022, Attention: Morris Missry, Esq. Notice shall be deemed effective upon actual receipt, or attempted delivery if receipt is refused. Either party may change its address for the purposes of this Agreement by giving the other party written notice of its new address.

10.3     **Enforcement of Agreement**: Any and all disputes, controversies and claims arising out of or relating to this agreement, or concerning the rights of any one or more parties hereto, or the respective obligations of any party to any other party hereto, shall be settled and

determined by arbitration in New York, New York in accordance with and pursuant to the then existing rules of the American Arbitration Association. The arbitrator's award shall be final and binding upon the parties and judgment hereof may be entered in any Court in the United States of America having jurisdiction over arbitration proceedings, or any other court having jurisdiction thereof.

10.4   **No Waiver of Rights:**  The failure of a party to insist upon strict adherence to any provision of this Agreement on any occasion shall not be considered or deemed to be a waiver nor considered or deemed to deprive that party of the right thereafter to insist upon strict adherence to that provision or any other provision of this Agreement. No custom or practice of the parties hereto at variance with the terms hereof shall constitute a waiver of that party's right to demand exact compliance with any of the terms herein at any time. Any waiver must be in writing, signed by both Licensor and Licensee.

10.5   **Complete Agreement; No Oral**
**Modification; Severability; Surviving Provisions:**

(a)    This Agreement is a complete statement of all agreements among the parties with respect to its subject matter. Any amendments, modification, alteration, change or waiver must be in writing.

(b)    If any provision of this Agreement is for any reason declared to be invalid or unenforceable, the validity of the remaining provisions shall not be affected thereby.

(c)    The recitals are hereby incorporated in this Agreement. Headings are used solely for convenience and should not be given any weight in the interpretation of this Agreement.

(d)    Any provision of this Agreement which by its plain import is intended to extend beyond expiration or termination, as the case may be, shall survive expiration or termination of the Licensed Term.

(e)    This Agreement shall be construed without regard to any presumption or any other rule requiring construction against the party causing this Agreement or any part thereof to be drafted.

(f)    The respective rights and remedies of the parties hereto, whether herein specified or otherwise, shall be cumulative, and the exercise of one or more of them shall not preclude the exercise of any or all other rights and remedies each such party has hereunder or by law.

10.6   **Confidentiality**. During the term of this Agreement, each party may have access to information concerning the other party's trade secrets, business and operations which information may not be accessible or known to the general public. The receiving party agrees not to use or disclose such information to any third party without obtaining the disclosing party's

prior written consent.  The parties agree that any breach or threatened breach by it of this provision shall entitle the disclosing party, in addition to all other legal remedies available to it, to a temporary or permanent injunction to enjoin such breach or threatened breach without the requirement of posting a bond or other undertaking.  Each party waives any defenses that the other party has an adequate remedy at law as a result of such breach.

**IN WITNESS WHEREOF** the parties have first caused this Agreement to be executed as of the later date of signature below.

**TOY PLAY, LLC**

By: _____

Name: _____

Title: _____

Date: _____

**GEOMETIX INTERNATIONAL, LLC**

By: _____

Name: _____

Title: _____

Date: _____

TOTAL P.03

# EXHIBIT B

**From:** Geometix [mailto:fentro@geometix.com]
**Sent:** Monday, April 05, 2004 9:39 PM
**To:** Steven Betesh
**Cc:** Jonathan Breiter; hlconroy@pacbell.net; Allan J. Weiss
**Subject:** FW: Insurance terms

Steven - we will have to address product liability/ insurance issue another way - our deal isn't going to work if I have to pay another $30K/year for liability insurance.   I was prepared to spend $5K or so per year, but $30K AND a lab study AND having to cover new molds (which will be easily $20-30K as well) - well the numbers no longer work. Can't you guys provide blanket insurance? Maybe we can structure the deal another way. Sorry for this - I just found it out today.

**Warren Scott Fentress**

fentro@geometix.com

(203) 775-0265

-----Original Message-----
**From:** David Lindsay [mailto:dlindsay@randinsurance.com]
**Sent:** Monday, April 05, 2004 4:00 PM
**To:** Geometix
**Subject:** RE: Insurance terms

Warren: I had a long conversation w/ our underwriter at CNA E&S re your coverage situation.. They provide a market for toy manufacturers, but have a $30,000 minimum premium, so they wont be of assist to you at this point..

I was informed by the u/w that all importers of foreign manufactured toys are required to provide the US Consumer Products Safety Commission w/ a complete independent lab study on the safety qualifications of the product.. In addition they require a copy of quality control and record keeping procedures.. I am afraid that any carrier that we go to is going to be looking for this info..

Let me know your thoughts..

David D. Lindsay
Rand Insurance, Inc.
50 Locust Avenue
New Canaan CT  06840
(203) 966-2677 phone
(203) 966-7355 fax
dlindsay@randinsurance.com

-----Original Message-----
**From:** Geometix [mailto:fentro@geometix.com]
**Sent:** Monday, April 05, 2004 11:43 AM
**To:** David Lindsay
**Subject:** Insurance terms

David - here's the contract text:

**Insurance Requirement**

(a)     Simultaneously with the execution of this Agreement, each of Licensor and Licensee shall promptly obtain and maintain in full force and effect at all times during the Licensed Term and for at least two (2) years thereafter, at its own cost and expense, liability insurance with respect to the Patent and any products to be constructed or developed incorporating the Patent in the amount of Two Million ($2,000,000.00) Dollars each of primary and umbrella coverage from one or more insurance companies, each with a Best's rating of "A" or better. Such liability insurance shall cover any claims, demands, causes of action and damages, including reasonable attorneys' fees arising from any liability arising from Licensee's use of the Patent.   Such insurance policy shall:

(i)          provide for coverage resulting from claims reported after the policy period;

(ii)          name the other party hereto as an additional insured thereunder; and

(iii)          provide for at least thirty (30) days prior written notice to the party hereto of any cancellation, modification, surrender, or any other action that would affect the other party's status or benefits thereunder.

(b)     Each party shall promptly furnish or cause to be furnished to the other party evidence, in form and substance satisfactory to such party, of the maintenance and renewal of the insurance required herein, including, but not limited to, copies of policies with applicable riders and endorsements, Certificates of Insurance, and Continuing Certificates of Insurance.

**Warren Scott Fentress**

fentro@geometix.com

(203) 775-0265

# EXHIBIT C



**ROBERT PREVITO, ESQ.**

Attorney At Law

235 Brooksite Drive
Hauppauge, New York 11788
(631) 265-4494    Fax (631) 265-4382
rprevito@hotmail.com

November 8, 2007

Mr. Steven Betesh, President
Toy Play, LLC
1 East 33rd Street
New York, New York 10016

Re:    *Geometix International, LLC v. Toy Play, LLC*

Dear Mr. Betesh:

I have been retained to represent Geometix International, LLC in connection with your company's breach of a License Agreement executed by and between Toy Play, LLC and Geometix International LLC on April 5, 2004.

Pursuant to the terms of the Agreement, Toy Play agreed to purchase from Geometix one million SKU within 24 months of signing of the contract, which Toy Play failed to do. Toy Play also failed to pay the amounts due under Section 7.0 of the contract, and failed to fund any of the marketing, nor perform any of the distribution, which it also promised to provide under the Agreement. In addition, and despite my client's repeated demands, Toy Play failed to pay any part of the advance payment of One Hundred Five Thousand ($105,000.00) Dollars due Geometix under Section 4.2.

Accordingly, Toy Play, LLC is in breach of contract, and Geometix has suffered substantial damages as a result, of an actual, incidental, consequential, and expectant nature. We roughly estimate these damages at twenty million dollars or more, due to the exponential factors related to the loss of sales, loss of market share, and loss of product recognition resulting from Toy Play's failure to market, promote, purchase, and distribute the Geometix products it agreed to license.

Under the terms of the Agreement, both parties agreed to arbitrate in the event of a breach or dispute. Accordingly, in the event that I receive no response from Toy Play, LLC, or its attorneys, within three weeks of even date, my client shall have no choice but to file for arbitration. Nevertheless, in the hopes that this matter can be settled amicably, please have your company's attorneys contact me after reviewing this communication, and the Agreement, to discuss a potential resolution.

In the event that I hear nothing by November 30th, 2007, Toy Play will leave my client no recourse but to file for arbitration without further notice. Kindly help us avoid this unpleasant exigency.

Very truly yours,

Robert Previto

RPP/rsa
cc: W. Fentress, Geometix International, LLC.