Toy Play LLC v. Geometix International, LLC

07-CV-11226 (WHP)

**EXHIBIT A – DEFENDANT'S ANSWER**

**License Agreement of April 5, 2004**

## LICENSE AGREEMENT

     THIS LICENSE AGREEMENT (the "Agreement") is made and entered into as of the later date of execution below (the "Effective Date"), by and between GEOMETIX INTERNATIONAL LLC, a limited liability company having an address at 101 Heatherwood Drive, Brookfield, Connecticut 06804 (hereinafter the "Licensor") and TOY PLAY, LLC a New York limited liability company having its principal office at 1 East 33rd Street, New York, New York 10016 (hereinafter the "Licensee").

## R E C I T A L S:

     WHEREAS, Licensor owns all right, title and interest in and to the patent entitled "System of Educational Magnetic Blocks," Patent Pending No. 10/678,764 (hereinafter the "Patent") and has the unrestricted right to grant a license to a third party in connection with the manufacture, distribution, sale, advertising and promotion of all products utilizing the Patent; and

     WHEREAS, Licensor owns all right, title and interest in and to the pending trademark entitled "MagneBlocks" U.S. registration no. 78307752 (hereinafter the "Trademark") and has the unrestricted right to grant a license to a third party in connection with the manufacture, distribution, sale, advertising and promotion of all products utilizing the Trademark; and

     WHEREAS, Licensee wishes to be granted an exclusive license to use the Patent and the Trademark in conjunction with the Licensed Products throughout the Territory; and

     WHEREAS, Licensor is willing to grant to Licensee a license under the terms and conditions specifically set forth herein.

     NOW, THEREFORE, in consideration of the mutual covenants, undertakings, and premises contained herein, and other good and valuable consideration, the receipt of which the parties hereby acknowledge, it is hereby agreed to as follows:

### 1. Definitions

     1.1    **Licensed Products**: shall be defined as all children's building blocks utilizing magnetic pulls to hold the pieces together, which contain the Patent or bear any other Intellectual Property (as hereinafter defined) owned by Licensor, as such may be modified or improved from time to time.

     1.2    **Territory**: shall initially consist of the United States, its territories, possessions and Puerto Rico, Mexico and Canada, and, subject to Section 2.1(b) herein shall be expanded to include the European Territory defined as the European Union, Australia, New Zealand and South Africa.

1.3  **Intellectual Property**:  shall consist of the Patent, the Trademark and all trademarks, tradenames, trade secrets, trade dress and copyrights owned by the Licensor which are associated in any way with the Patent, including, without limitation those rights set forth in Exhibit A.

## 2. Grant

2.1  **License Grant:**

(a)  Licensor hereby grants to Licensee and Licensee hereby accepts the exclusive right and license, to use and to sublicense the use of the Patent throughout the Territory during the Licensed Term of this Agreement in connection with the advertising, promotion, sales and distribution and manufacturing, subject to Section 2.3, of the Licensed Products.  In connection therewith, Licensee shall also have the unrestricted right throughout the Licensed Term to utilize throughout the Territory all associated Intellectual Property owned by Licensor in connection with the Licensed Products, and the packaging and marketing thereof.

(b)  Licensee shall have the exclusive right to sell and distribute the Licensed Products in all channels of distribution throughout the Territory as determined in the sole discretion of Licensee, with the exception of the Internet, which will be non-exclusive. Any pricing by the Licensor must be no less than the retail pricing set by the Licensee. Without limiting the foregoing, the Licensee shall also have the exclusive right to sell or distribute the Licensed Products through all retail channels by direct marketing methods, including catalogue and mail order, home shopping shows, and direct mail within the Territory. In addition, if the cumulative gross sales of the Licensed Products exceed Ten Million ($10,000,000) Dollars (at invoiced wholesale price) by October 31, 2007, the Territory shall be expanded to include the European Territory, which shall be incorporated at such time into the "Territory." This Territory expansion will be contingent upon (i) assumption or assignment of any then-existing European contracts, (ii) a minimum sales guarantee to be determined by June 2005, (iii) an advance against royalties on sales with the European Territory of $50,000.00 USD payable to Licensee on or before December 1, 2007, and (iv) payment of royalties to Licensee at the same terms as the existing schedule. Prior to October 31, 2007, Licensor shall not grant any rights with respect to the sale and distribution of the Licensed Products throughout Europe, without the prior written consent of the Licensee, which shall not be unreasonably withheld.

2.2  **Licensor's Restrictions and Cooperation:**  In connection with the exclusive grant hereunder, Licensor hereby agrees that it shall not in any way utilize the Patent (or any confusingly similar Patent) nor grant to any third party the right to utilize the Patent (or any confusingly similar Patent) on or in connection with any products related to the Licensed Products throughout the Territory at any time during the Licensed Term, nor shall Licensor grant to any third party the right to utilize the Intellectual Property on or in connection with any products similar to the Licensed Products at any time during the Licensed Term.

2.3  **Intellectual Property:**  The Licensee shall have the right to create logos, tradenames, designs and trademarks to be used in connection with the Licensed Products and to direct manufacturers to incorporate such logos, tradenames, designs and trademarks on the

Licensed Products and all packaging and labeling in connection with the Licensed Products. All such intellectual property, including without limitation, logos, tradenames, designs, trademarks and copyrights shall be owned solely by the Licensee, and Licensor acknowledges that it shall not attack or contest the validity of such intellectual property or Licensee's rights in such intellectual property and Licensor shall not independently utilize any of such intellectual property (or any similar marks, designs, logos or creations) without the express prior written consent of Licensee. In the event any of such intellectual property is vested in the Licensor, Licensor hereby appoints Licensee as its attorney-in-fact to effectuate any transfers or assignments in accordance with this Section 2.3.

    2.4    **Manufacturing Rights.** The Licensee shall have the right to manufacture Licensed Products provided that, (i) within twenty-four months of the Effective Date, it shall have purchased 1,000,000 SKU's of the product line existing as of the Effective Date, at wholesale prices from Double Grand, and (ii) if a second product line is introduced using pieces not commercially available at the Effective Date, the Licensee shall have purchased 1,000,000 SKUs of that new product line with twenty-four months of commercial availability of such product line; or, if Licensor approves in advance, in writing, manufacturing by the Licensee prior to such goals are met. Licensee agrees to purchase such SKUs from Double Grand subject to the following conditions: (i)(a) The price quoted by a manufacturer other than Double Grand (the "Other Manufacturer") is not more than twenty (20%) percent lower that the price quoted by Double Grand for substantially the same product, and (b) the quality of the products generally produced by the Other Manufacturer is substantially similar to the quality of the products produced by Double Grand; (ii) the quality of the merchandise produced by the Double Grand must be, in the Licensee's discretion, at least equal to the quality of merchandise generally sold by Licensee within the channels of distribution for which such item is being sold; (iii) Double Grand may not dispose of any of the Licensed Products in an unauthorized manner; (iv) Double Grand must, in Licensee's reasonable discretion, have sufficient manufacturing capabilities to manufacture the quantity of goods necessary to satisfy Licensee's order; (v) Double Grand may not sell products similar to the Licensed Products to any third party; and (vi) Double Grand must be in full compliance with all labor laws in the place of the manufacture of the Licensed Products and in no event, may Double Grand employ any people under the age of 16 or use prison labor. To the extent provided for in the preceding two sentences, the Licensee will have the right to manufacture or have manufactured the Licensed Products by any manufacturer, as soon as 1,000,000 SKUs of each product line has been, whether or not such twenty-four month periods have elapsed, provided that such the Licensee or any third-party manufacturer engaged by it shall agree to commercially reasonable terms to protect the interests of Licensor in any such molds.

    3.  **Term and Volume Sales Requirements**

The term of this Agreement (the "Licensed Term") shall commence on the date hereof and shall extend until December 31, 2006 (the "Initial Term"). Licensee shall have the right to renew this Agreement for two (2) additional three-year (3 - year) periods, provided that (i) Net Sales as defined in Section 4.1(b) shall be no less than $5,000,000 USD through November 15, 2006; (ii) Net Sales for the period November 16, 2006 to November 15, 2009 shall be no less than $7,000,000 USD; and (iii) Net Sales for the period November 16, 2010 to November 15, 2012

shall be no less than $9,000,000. If these minimum sales goals are achieved, the agreement will automatically renew for the next renewal term unless the Licensee provides to Licensor written notice of its intention not to renew no less than 60 days prior to the end of the Initial Term or any subsequent renewal term. If the foregoing minimum volume requirements have not been met, Licensor may in its sole discretion renew the Agreement, including on a non-exclusive basis, subject to Licensor's right to terminate, as set forth in Section 7.2.

## 4. Royalties

4.1    **Royalties:** (a) In consideration of the license granted herein, Licensee shall pay to Licensor a royalty equal to ten (10%) percent of Net Sales of the Licensed Products (the "Earned Royalty") which shall be payable within thirty (30) days after the end of each calendar quarter during the Licensed Term (the "Quarterly Period").

(b)    The term "Net Sales" shall mean the gross invoice price charged for the Licensed Products sold by Licensee less all trade discounts, returns and chargebacks for damaged or defective units (not to exceed 10% of any shipment).

4.2    **Advance:** Upon the execution of this Agreement, Licensee shall pay to Licensor a non-refundable advance payment of One Hundred Five Thousand ($105,000) Dollars, which shall be applied against all royalties due to Licensor.

4.3    **Reports and Statements:** Concurrent with the payment of the Earned Royalty, Licensee shall submit to Licensor a written report relating to and including a calculation of the Net Sales made by Licensee during said Quarterly Period.

4.4    **Inspection of Books and Records:** Upon five (5) days written notice to Licensee and during regular business hours, Licensee shall permit Licensor and its duly authorized representatives, no more than two times during any twelve (12) month period, to inspect all books and records of Licensee relating to this Agreement. Licensee agrees to fully cooperate with such inspector, and in the event that any shortfall is discovered by Licensor, Licensee shall reimburse Licensor within thirty (30) days after the parties' resolution as to the amount of the shortfall. In the event that any payments owed by Licensee to Licensor are not paid when due, interest shall accrue on such amount at a rate of twelve (12%) percent per annum, commencing ten (10) days after written notice by Licensor to Licensee.

## 5. Patent

5.1    **Improvements:** Licensor shall use commercially reasonable efforts to enhance and further the Patent, and the technology underlying the Patent, and shall expend such amounts as are necessary for such purpose. All enhancements and improvements developed or created by or for Licensor in connection with the Licensed Products and/or the Patent shall be made available to Licensee at no additional cost to Licensee so that, at Licensee's sole option, such enhancements and improvements shall be incorporated into the Licensed Products in order that throughout the Licensed Term, Licensee shall always be entitled to the most current state-of

the art designs and technologies for the Licensed Products. All patents or letter patent issued on improvements to the Patent conceived or reduced to practice during the Licensed Term hereof shall be the exclusive property of Licensor, subject to Licensee's exclusive right to utilize such Patent pursuant to the terms of this license granted herein. Licensor shall promptly prepare, file and prosecute, at its own expense, patents and applications for letters patent in the United States and in all other countries in which Licensee is selling Licensed Products for all improvements made by Licensor during the Licensed Term, in which countries patents are pending or have issued. Licensor shall do all acts necessary for obtaining, sustaining, reissuing or extending Patents or letters patent based on the Patent, including all improvements and shall defend and give testimony and otherwise provide evidence in case of interference. In the event that Licensee elects not to incorporate such improvement or technology into the Licensed Products, Licensor shall not be permitted to license, or otherwise permit the use of, such technology or patent to any third party, without the prior written consent of the Licensee.

## 6.  Representations and Warranties

6.1    **Licensee's Representations, Warranties and Covenants:**  In addition to and without limiting any of Licensee's other representations set forth throughout this Agreement, in any way, Licensee hereby represents, warrants and covenants that:

(a)  Licensee currently has and will continue to have throughout the Licensed Term and Sell-Off Period, the full right, power and authority to enter into this Agreement and to assume and perform all of its duties and obligations hereunder;

(b)  This Agreement has been duly and validly executed by Licensee and constitutes a valid and binding agreement of Licensee, enforceable against Licensee in accordance with its terms.

(c)  Licensee is duly organized, validly existing and in good standing under the laws of the state of New York and has all requisite power to own, lease and operate its properties and to carry on its business as now being contemplated by this Agreement.

6.2    **Licensor's Representations, Warranties and Covenants:**  In addition to and without limiting any of Licensor's other representations set forth throughout this Agreement, in any way, Licensor hereby represents, warrants and covenants that to the best of its knowledge:

(a)  Licensor is the owner of the Patent and the Intellectual Property with the sole and exclusive good and valid title to the Patent and the Intellectual Property, which are free and clear of any liens, charges or encumbrances of any kind whatsoever;

(b)  Licensor is the sole inventor and developer of the Patent and no other person or entity had or shall have any claim or ownership with respect to the Patent;

(c)  Licensor has taken all necessary action to maintain the continued validity of the Patent and the Intellectual Property throughout the countries in the Territory in which patent registrations have been filed;

(d)  There are no allegations or actions pending or threatened against the Patent and the Intellectual Property, which seeks to nullify, cancel or in any way invalidate the Patent or the Intellectual Property, and Licensor has not asserted any allegation, action or claim with respect to the Patent or the Intellectual Property;

(e)  Licensor has not previously assigned, licensed, transferred, conveyed or otherwise encumbered its right, title and interest in the Patent or the Intellectual Property;

(f)  Licensor is solvent and is not currently or in the past subject to bankruptcy proceedings nor is it contemplated that Licensor will be subject bankruptcy proceedings in the future; and

(g)  The design of the Licensed Products, when used for their intended purposes, will not cause harm to any person.

6.3    **Indemnifications:**

(a)  Licensor hereby indemnifies and holds harmless Licensee and its officers, employees, customers, sublicensees and representatives (the "Licensee Indemnified Parties") from and against any and all such claims, actions, liabilities, losses, and damages (including, without limitation, costs and expenses and reasonable attorneys' fees and disbursements) from third parties arising from (i) the use by any or all of the Licensee Indemnified Parties of the Patent or any other Intellectual Property in accordance with the provisions of this Agreement and (ii) any breach by Licensor of any or all of its representations or warranties hereunder.  These indemnifications shall survive expiration or termination of the Licensed Term.  In the event of any claim of intellectual property infringement, Licensor may in its sole discretion (i) obtain rights from third parties or (ii) if no other commercially reasonable alternatives are available, terminate this Agreement, in whole or in part, provided however that the Licensee shall have the right but not the obligation to defend any such intellectual property infringement claim at its sole expense.  The obligation to indemnify will be contingent upon the Licensee (i) providing Licensor with prompt written notice of any claim for which indemnification is sought; (ii) cooperating fully with Licensor at Licensor's expense; and (iii) allowing Licensor to control the defense and settlement of such claim.  The Licensee may, at its own expense, assist in the defense if it so chooses.

(b)  Licensee hereby indemnifies and holds harmless Licensor and its officers, employees, customers, sublicensees and representatives from and against any and all such claims, actions, liabilities, losses, and damages (including, without limitation, costs and expenses and reasonable attorneys' fees and disbursements) from third parties arising from (i) any liability arising from the manufacture of the Licensed Products in accordance with the provisions of this Agreement and (ii) any breach by Licensee of any or all of its representations or warranties

hereunder. These indemnifications shall survive expiration or termination of the Licensed Term. The obligation to indemnify will be contingent upon Licensor (i) providing the Licensee with prompt written notice of any claim for which indemnification is sought; (ii) cooperating fully with the Licensee at the Licensee's expense; and (iii) allowing the Licensee to control the defense and settlement of such claim. Licensor may, at its own expense, assist in the defense if it so chooses.

## 7. Termination

**7.1    Cessation of Agreement:**    Subject to the continuing obligations arising from a breach hereof and those terms that survive cessation of this Agreement (including Licensee's right to sell-off as set forth in Section 7.3), this Agreement and all rights relevant thereto shall cease upon the earlier of termination, for whatever reason, or expiration and revert to Licensor who shall thereafter be free from any restriction whatsoever, to use and to license others to use the Patent in connection with the Licensed Products within the Territory.

**7.2    Termination Procedure:**

(a)    In the event either party breaches any of the terms and/or conditions or any of the representations and warranties contained in this Agreement, the other party shall have the right to terminate this Agreement by giving notice of termination to breaching party, provided however that the breaching party shall have thirty (30) days from its receipt of written notification in which to completely remedy said breach.

(b)    Upon the occurrence of any of the following, written notice of which is hereby required to be given to the Licensor, the Licensee shall have the option, but not the duty, to terminate this Agreement on written notice to other as of the earliest date on which any of the following events occur: (i) The filing of a petition by or against the Licensor under the United States Bankruptcy Act, as amended, or under the insolvency laws of any state, or in the event that the Licensor or a third party commences a proceeding or files a petition of similar import under another applicable bankruptcy or insolvency law in which the Licensor is the subject of such action and such action is not dismissed within 90 days thereafter; (ii) Licensor commits any act or offense involving moral turpitude under Federal, state or local laws or any act whatsoever, which may bring Licensee into dispute, scorn, contempt, scandal or ridicule.

(c)    Upon the occurrence of any of the following, written notice of which is hereby required to be given to the Licensee, the Licensor shall have the option, but not the duty, to terminate this Agreement on written notice to other as of the earliest date on which any of the following events occur: (i) The filing of a petition by or against the Licensee under the United States Bankruptcy Act, as amended, or under the insolvency laws of any state, or in the event that the Licensee or a third party commences a proceeding or files a petition of similar import under another applicable bankruptcy or insolvency law in which the Licensee is the subject of such action and such action is not dismissed within 90 days thereafter; (ii) Licensee commits any act or offense involving moral turpitude under Federal, state or local laws or any act whatsoever, which may bring Licensor into dispute, scorn, contempt, scandal, ridicule, or any art that will

shock, insult or offend the Licensor's industry or the public, (iii) if the cumulative Earned Royalty as of December 31, 2006 is less than Five Hundred Thousand ($500,000) Dollars; provided that in such an event, Licensee shall be permitted to pay Licensor the difference between $500,000 and the aggregate Earned Royalty paid or earned through the period ending December 31, 2006, and Licensor shall have no right to terminate this Agreement.

(d) In the event the Licensee is unable to meet the volume requirements stated in Section 3, and in the event that, notwithstanding such fact, Licensor has agreed to renew this Agreement, Licensor shall have the right, in its sole discretion, but not the obligation, to terminate any or all rights under this Agreement with thirty (30) days written notice to the Licensee.

7.3     **Continued Sales After Expiration or Termination**: Subject to the conditions set forth herein, upon expiration of this Agreement or upon its termination for any reason, Licensee shall have a reasonable time on a non-exclusive basis, not to exceed six (6) months from the expiration or termination date of this Agreement, in which to dispose of its then existing inventory and work in process of Licensed Products (hereinafter referred to as the "Sell-Off Period") by selling and distributing such Licensed Products pursuant to the provisions of this Agreement. Within thirty (30) days following the close of the Sell-Off Period, Licensee shall remit to Licensor all required Earned Royalties on such Net Sales.

8. **Insurance Requirement**

(a)     Simultaneously with the execution of this Agreement, each of Licensor and Licensee shall promptly obtain and maintain in full force and effect at all times during the Licensed Term and for at least two (2) years thereafter, at its own cost and expense, liability insurance with respect to the Patent and any products to be constructed or developed incorporating the Patent in the amount of Two Million ($2,000,000.00) Dollars each of primary and umbrella coverage from one or more insurance companies, each with a Best's rating of "A" or better. Such liability insurance shall cover any claims, demands, causes of action and damages, including reasonable attorneys' fees arising from any liability arising from Licensee's use of the Patent. Such insurance policy shall:

(i)     provide for coverage resulting from claims reported after the policy period;

(ii)     name the other party hereto as an additional insured thereunder; and

(iii)     provide for at least thirty (30) days prior written notice to the party hereto of any cancellation, modification, surrender, or any other action that would affect the other party's status or benefits thereunder.

(b)     Each party shall promptly furnish or cause to be furnished to the other party evidence, in form and substance satisfactory to such party, of the maintenance and renewal

of the insurance required herein, including, but not limited to, copies of policies with applicable riders and endorsements, Certificates of Insurance, and Continuing Certificates of Insurance.

## 9. Marketing

9.1     Upon receipt of the aggregate of Five Million ($5,000,000) Dollars in gross sales, Licensee agrees to expend One Million ($1,000,000) Dollars over the twelve (12) month period for the advertising of the Licensed Products on television throughout the Licensed Territory. The content of such advertising campaign shall be in the sole discretion of the Licensee, provided the content shall be approved in advance in writing by Licensor, which approval shall not unreasonably be withheld. Licensor shall not have the right to advertise the Licensed Products in the Territory without the prior written consent of the Licensee, which consent shall not unreasonably be withheld. Licensor has the right to market and advertise the Licensed Products throughout Europe until such time as the Licensee shall obtain the exclusive rights to Europe, as provided for herein, at which time Licensor shall no longer advertise or market the Licensed Products in Europe.

9.2     Licensee shall display the Licensed Products at such trade shows as it shall deem reasonably necessary for the efficient promotion and sale of the Licensed Products.

9.3     Licensor agrees to be available, at Licensee's reasonable request, to advise, consult and work with Licensee in connection with the marketing and packaging of the Licensed Products and with respect to layout and design of the Licensed Products. It is understood that Licensor shall have final approval rights with respect to such matters, which approval shall not unreasonably be withheld.

## 10. Miscellaneous

10.1     **Limitation of Relationship:** Nothing contained herein shall be construed to place either party in the relationship of legal representative, partner, joint venturer, principal, or agent of the other, and neither party shall have the authority to obligate or bind the other.

10.2     **Notices:** Any notices to be given under this Agreement shall be in writing and shall for all purposes be deemed to be fully given by a party when sent by certified or registered mail, postage prepaid, return receipt requested, or reputable overnight carrier (signature required on receipt), to the other party at the respective address set forth in the beginning of this Agreement. Copies of all notices to Licensee shall be concurrently sent to: Wachtel & Masyr, LLP, 110 East 59th Street, New York, NY 10022, Attention: Morris Missry, Esq. Notice shall be deemed effective upon actual receipt, or attempted delivery if receipt is refused. Either party may change its address for the purposes of this Agreement by giving the other party written notice of its new address.

10.3     **Enforcement of Agreement:** Any and all disputes, controversies and claims arising out of or relating to this agreement, or concerning the rights of any one or more parties hereto, or the respective obligations of any party to any other party hereto, shall be settled and

determined by arbitration in New York, New York in accordance with and pursuant to the then existing rules of the American Arbitration Association. The arbitrator's award shall be final and binding upon the parties and judgment hereof may be entered in any Court in the United States of America having jurisdiction over arbitration proceedings, or any other court having jurisdiction thereof.

10.4    **No Waiver of Rights:**  The failure of a party to insist upon strict adherence to any provision of this Agreement on any occasion shall not be considered or deemed to be a waiver nor considered or deemed to deprive that party of the right thereafter to insist upon strict adherence to that provision or any other provision of this Agreement.  No custom or practice of the parties hereto at variance with the terms hereof shall constitute a waiver of that party's right to demand exact compliance with any of the terms herein at any time.  Any waiver must be in writing, signed by both Licensor and Licensee.

10.5    **Complete Agreement; No Oral Modification; Severability; Surviving Provisions:**

(a)    This Agreement is a complete statement of all agreements among the parties with respect to its subject matter.  Any amendments, modification, alteration, change or waiver must be in writing.

(b)    If any provision of this Agreement is for any reason declared to be invalid or unenforceable, the validity of the remaining provisions shall not be affected thereby.

(c)    The recitals are hereby incorporated in this Agreement.  Headings are used solely for convenience and should not be given any weight in the interpretation of this Agreement.

(d)    Any provision of this Agreement which by its plain import is intended to extend beyond expiration or termination, as the case may be, shall survive expiration or termination of the Licensed Term.

(e)    This Agreement shall be construed without regard to any presumption or any other rule requiring construction against the party causing this Agreement or any part thereof to be drafted.

(f)    The respective rights and remedies of the parties hereto, whether herein specified or otherwise, shall be cumulative, and the exercise of one or more of them shall not preclude the exercise of any or all other rights and remedies each such party has hereunder or by law.

10.6    **Confidentiality.**  During the term of this Agreement, each party may have access to information concerning the other party's trade secrets, business and operations which information may not be accessible or known to the general public.  The receiving party agrees not to use or disclose such information to any third party without obtaining the disclosing party's

FILE No.004 04/05 '04 17:29  ID:WESTIN R10 MAR S EXPRESS  FAX:787 888 6600      PAGE  1

prior written consent.  The parties agree that any breach or threatened breach by it of this provision shall entitle the disclosing party, in addition to all other legal remedies available to it, to a temporary or permanent injunction to enjoin such breach or threatened breach without the requirement of posting a bond or other undertaking.  Each party waives any defenses that the other party has an adequate remedy at law as a result of such breach.

**IN WITNESS WHEREOF** the parties have first caused this Agreement to be executed as of the later date of signature below.

**TOY PLAY, LLC**

By: _____

Name: _____ Steven Bentil

Title: _____President_____

Date: _____4/5/04_____


**GEOMETRIX INTERNATIONAL, LLC**

By: _____

Name: ___Warren Fentress____

Title: ___President_____

Date: ___4/5/04_____

TOTAL P.03

ROBERT PREVITO, ESQ. (RP6514)
235 Brooksite Drive
Hauppauge, New York 11788
631-265-4494  f: 631-265-4382  *RPrevito@hotmail.com*
Attorneys for Defendant Geometix International, LLC


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

TOY PLAY, LLC,                                          :

                                    Plaintiff,          :
                                                        :
                    - against -                         :
                                                        :
GEOMETIX INTERNATIONAL, LLC,                            :
                                                        :
                                    Defendant.          :

-------------------------------------------------------------x

HON. WILLIAM PAULEY III

Civil Action No. 07 CV 11226

**ANSWER and COUNTERCLAIMS**

Defendant, GEOMETIX INTERNATIONAL, LLC., (hereinafter "GEOMETIX") by its attorney, Robert Previto, Esq., hereby Answers plaintiff's Complaint and asserts Affirmative Defenses and Counterclaims as follows:

ANSWER TO "PARTIES, JURISDICTION and VENUE"

1.      Defendant admits the allegation in Paragraph 1 of the Complaint.

2.      Defendant admits the allegation in Paragraph 2 of the Complaint.

3.      Defendant denies the allegation in Paragraph 3 of the Complaint.

4.      Defendant denies the allegation in Paragraph 4 of the Complaint, since the parties agreed that "all disputes" arising from their Agreement would be submitted to Arbitration in New York, which presumptively includes any Declaratory Judgment Action to void or deem the Agreement of no legal effect.  (See Exhibit A, Article 10.3.)

5.      Defendant admits the allegation in Paragraph 5 of the Complaint but denies that

1

venue is proper since the parties agreed that all disputes would be submitted to Arbitration in New York, which presumptively includes any Declaratory Judgment Action to void or deem the Agreement of no legal effect.  (See Exhibit A, Article 10.3.)

<u>ANSWER TO "THE CIRCUMSTANCES GIVING RISE TO THIS ACTION"</u>

6.    Defendant admits the allegation in Paragraph 6 of the Complaint.

7.    Defendant admits the allegation in Paragraph 7 of the Complaint but notes that the "intellectual property" referred to by Defendant specifically consisted of U.S. Trademark Registration No. 78/307,752 for "MagneBlocks" and Patent Pending No. 10/678,764 for a "System of Educational Magnetic Blocks" and " . . . all trademarks, tradenames, trade secrets, trade dress and copyrights owned by the Licensor which are associated in any way with the Patent," moreover, that the Agreement included, *inter alia,* the granting of manufacturing rights of the said intellectual property to the Plaintiff from Defendant, as well as the right and duty to sell, distribute and purchase said intellectual property as actual products, e.g. MagneBlocks toys, (hereinafter "MagneBlocks").

8.    Defendant admits the allegation in Paragraph 8 of the Complaint.

9.    Defendant denies the allegation in Paragraph 9 of the Complaint.

10.    Defendant admits the allegation in Paragraph 10 of the Complaint.

11.    Defendant denies the allegation in Paragraph 11 of the Complaint.

12.    Defendant denies the allegation in Paragraph 12 of the Complaint.

13.    Defendant denies the allegation in Paragraph 13 of the Complaint.

14.    Defendant denies knowledge or information sufficient to form a belief as to the allegation in Paragraph 14 of the Complaint averring that "between approximately May 2004 and November 8, 2007, there were no communications between Toy Play, LLC and Geometix"; but

Defendant admits that the attorney for Defendant sent the letter of November 8, 2007 to Toy Play, LLC which is annexed to the Complaint as Exhibit C; however Defendant denies the allegation made by the Plaintiff that the said letter or said attorney ever described the Contract of April 5, 2004, whether in letter or conversation, as a "Proposed Agreement" or one that "had never taken effect."

      15.    Defendant admits the allegation in Paragraph 15 of the Complaint insofar as Toy Play LLC requested, and Defendant's counsel forwarded, a copy of the Contract to Plaintiff on or about November 21, 2007; however, Defendant denies knowledge or information sufficient to form a belief

that Plaintiff "had no copy of any contract signed by Geometix in its files"; and Defendant denies that the Contract which Defendant's counsel forwarded to Plaintiff contained a ". . . *purported* signature from Fentress . . ."; (italics added) and denies that "this was the first time Toy Play ever saw a copy" of the Contract ". . . signed by Geometix."

      16.    Defendant denies the allegation in Paragraph 16 of the Complaint.

      17.    Defendant admits the allegation in Paragraph 17 of the Complaint.

      18.    Defendant admits the allegation in Paragraph 18 insofar as Defendant has the right to invoke an arbitration clause under the Contract of April 5, 2004 executed between the parties; but Defendant denies that the Contract ". . .was never of any legal effect and that the parties never recognized [it] as such."  Defendant lacks knowledge and information sufficient to form a belief as to any "reasonable apprehension" that Plaintiff ". . . will face imminent legal action from Geometix [etc.] . . . ", but Defendant denies that the Contract ". . . never became legally binding or effective," and admits that ". . . there is at present an actual controversy between the parties."

<u>ANSWER TO "COUNT I, DECLARATORY JUDGMENT"</u>

19.    Geometix repeats, reiterates and realleges its Answers to Paragraphs 1 through 18 hereinabove as if fully set forth herein.

20.    Defendant admits the allegation in Paragraph 20 but reserves its right to modify the projection of damages at "$20 million" upward or downward in value as more accurate actuarial and analysis and information are applied to lost sales and lost potential sales and royalties, or comes to light throughout the course of this litigation and/or any subsequent arbitration.

21.    Defendant denies the allegation in Paragraph 21 of the Complaint.

22.    Defendant denies the allegation in Paragraph 22 of the Complaint, and asserts that the Contract of April 5, 2004 executed between the parties constitutes a legally binding agreement and a written memorialization of the two parties meeting of minds; and consequently Toy Play, LLC is obligated to arbitrate all of Geometix's claims, (pled with hereinunder in the Counterclaims); and Geometix has *bona fide* claims for breach of contract.

<u>AFFIRMATIVE DEFENSES</u>

<u>AS AND FOR A FIRST AFFIRMATIVE DEFENSE</u>

23.    Defendant repeats, reiterates, and realleges the foregoing as if fully set forth herein.

24.    Plaintiff's action for a Declaratory Judgment must be dismissed since Plaintiff fails to state a cause of action against the Defendant upon which relief may be granted.

25.    Plaintiff has submitted a written Contract duly executed by Plaintiff and Defendant, identified as a License Agreement, as Exhibit A of its Complaint, which Defendant also annexes hereto as its own Exhibit A.  (See Exhibit A.)

26.    The said Contract resulted from several months of negotiations made by and between

the Plaintiff and Defendant, both of which were independently represented by sophisticated advisers, and the License Agreement constitutes *prima facie* evidence that a binding Contract exists.

27.     The said Contract is not only evidenced by the License Agreement itself, but by written e-mail communications made by and between the parties both before *and* after the execution of the License Agreement on April 5, 2004.  (See Exhibit B)

28.     Plaintiff has made no allegations, and submitted no evidence, tending to prove that the said Contract *in toto* was mutually rescinded, repudiated, voided, or void *ab initio,* but merely claimed that a collateral term of the contract regarding insurance coverage, which was raised and renegotiated *after* the Contract's execution, somehow operates to nullify the entire Contract.

29.     Further to Articles 10.4 and 10.5(b)  of said Licensing Agreement, entitled No Waiver of Rights and Complete Agreement; No Oral Modification; Severability; Surviving Provision; a waiver or modification of one term of the Licensing Agreement, including the said insurance coverage term, will not affect " . . . the validity of the remaining provisions . . . " (See Exhibit A.)  Thus, any dispute over the insurance coverage terms, even if valid, which it is not, is severable.

30.     Plaintiff also erroneously claims that Defendant did not sign the License Agreement on April 5, 2004, and that Plaintiff and Defendant had no subsequent communications and resolution regarding the insurance clause of the Contract, which are both untrue.  (See Exhibit B.)

31     Plaintiff has therefore pled and brought its Complaint in bad faith, and without sufficient particularity, to allege that the Contract is of no legal effect, and thereby failed to state a cause of action against Defendant upon which relief may be granted.

32.     Wherefore, Plaintiff's Declaratory Judgement action must be dismissed.

5

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

33.    Defendant repeats, reiterates, and realleges the foregoing as if fully set forth herein.

34.    Plaintiff's action for a Declaratory Judgement must be dismissed since Plaintiff is barred from bringing this action by the doctrine of waiver and estoppel.

35.    Pursuant to Article 10.3 of the said Licensing Agreement, the Plaintiff and Defendant agreed that: "*Any and all* disputes, controversies and claims arising out of *or relating to this agreement* . . . .shall be settled by *arbitration* in New York . . . ." (Italics added. See Exhibit A.)

36.    Plaintiff has acknowledged that it executed the Agreement by and through its President and CEO, Stephen Betesh, yet has provided no evidence of rescission or voidness.

37.    The Plaintiff is thereby barred from bringing this action to prove or disprove the contract in any forum other than arbitration in New York, including this United States District Court of the Southern District.

38.    Wherefore, Plaintiff's Declaratory Judgment action must be dismissed, since the only proper forum for this dispute is arbitration in New York.

## AS AND FOR A

## FIRST COUNTERCLAIM

39.    Defendant repeats, reiterates, and realleges the foregoing as if fully set forth herein.

40.    Defendant and Plaintiff negotiated, over the course of several months in 2004, a License Agreement which constitutes a valid Contract between the parties. (See Exhibit A.)

41.    Under the basic terms of the Contract, Defendant Geometix granted Plaintiff Toy Play the right to manufacture, distribute, sell, advertise and promote toys designed and trademarked by Geometix, (e.g. "MagneBlocks") for the purpose of wholesale and retail sale to the public.

42.     In consideration of its right to manufacture, distribute, sell, advertise, and promote MagneBlocks, Plaintiff agreed, *inter alia,* to pay Defendant an advance payment of One Hundred Five Thousand ($105,000.00) Dollars, under Section 4.2 of the License Agreement. (See Exhibit A).

43.     Plaintiff never paid Defendant any part of the One Hundred Five Thousand ($105,000.00) Dollars advance payment due under the Contract.

44.     Plaintiff's failure to pay the said advance payment to Defendant constituted a breach of its Contract with Defendant and caused damages to the Defendant in the amount of $105,000.00.

45.     Wherefore, Defendant demands reimbursement from Plaintiff for its losses on the First Counterclaim for Breach of Contract in the amount of $105,000.00 Dollars.

AS AND FOR A

SECOND COUNTERCLAIM

46.     Defendant repeats, reiterates, and realleges the foregoing as if fully set forth herein.

47.     In further consideration , Plaintiff agreed, *inter alia,* to purchase from Defendant's former manufacturer of MagneBlocks, (a company called Double Grand,) one million existing SKU's of MagneBlocks, within twenty-four months of the signing of the said Contract.

48.     The price of each unit of MagneBlocks which Plaintiff agreed to purchase from Double Grand was to be determined between the Plaintiff, Defendant and Double Grand as per certain terms in the Contract under Article 2.4 . (See Exhibit A.)

49.     Plaintiff never purchased any units of MagneBlocks from Double Grand, and never bothered determining, researching, or discussing the price for the purchase.

50.     Plaintiff 's failure to purchase the one million SKU's of MagneBlocks, and failure to determine, research or set a price for the one million SKU"s, constituted a breach of its Contract

7

with Defendant and caused damages to Defendant in an estimated amount of Three Million ($3,000,000.00) Dollars.

51.    Wherefore, Defendant demands reimbursement from Plaintiff for its losses on the Second Counterclaim for Breach of Contract in the amount of $3,000,000.00 dollars.

AS AND FOR A

THIRD COUNTERCLAIM

52.    Defendant repeats, reiterates, and realleges the foregoing as if fully set forth herein.

53.    In further consideration, Plaintiff agreed, *inter alia,* to manufacture, market, distribute and sell MagneBlocks and the License Agreement sets forth specific minimum sales target goals in the many millions of dollars, connected to projected income and tied to the renewal terms of the contract..  (See Article 3, Exhibit A.)

54.    Moreover, Defendant was to receive, as its further consideration, royalties equal to 10% percent of the net Sales of MagneBlocks from Plaintiff within thirty days of the end of each Quarterly Period, under  Article 4.1 of the License Agreement, for each product sold.

55.    Plaintiff never took any steps whatsoever to manufacture, market, distribute or sell MagneBlocks, and never paid any royalties to the Defendant.

56.    As a result of Plaintiff's failure to manufacture, market, distribute or sell Magneblocks, or pay any royalties to the Defendant, Plaintiff breached its contract with Defendant, and Defendant was damaged in lost royalties of 10% on the projected amount of sales of Nine Million ($9,000,000.00) Dollars, e.g., an actual sum Nine Hundred Thousand ($900,000.00) Dollars.

57.    Wherefore, Defendant demands reimbursement from Plaintiff for its losses on the Third Counterclaim for Breach of Contract in the amount of $900,000.00 Dollars.

AS AND FOR A

FOURTH COUNTERCLAIM

58.    Defendant repeats, reiterates, and realleges the foregoing as if fully set forth herein.

59.    In further consideration, Plaintiff agreed, *inter alia,* under Article 7.2 of the said License Agreement, that if it terminated its Contract with Defendant and the cumulative earned Royalty as of December 31, 2006 was less than Five Hundred Thousand ($500,000.00) Dollars, Plaintiff would pay Defendant the difference between $500,000.00, and the aggregate Earned Royalty paid or earned by Defendant during the period ending December 31, 2006.  (See Exhibit A).

60.    Plaintiff never paid any Earned Royalty to the Defendant.

61.    However, by refusing Defendant's demands that Plaintiff perform on its duties under the Contract; moreover, by instituting this action, Plaintiff has, *ipso facto*, terminated the Contract, and owes Defendant $500,000.00 under Article 7.2 of the License Agreement, as the difference between that amount and the zed that Plaintiff has actually paid to Defendant in Earned Royalty.

62.    The failure of Plaintiff to pay Defendant the said $500,000.00 constitutes Breach of Contract, and has damaged Defendant in the amount of $500,000.00.

63.    Wherefore, Defendant demands reimbursement from Plaintiff for its losses on the Fourth Counterclaim for Breach of Contract in the amount of $500,000.00 Dollars.

AS AND FOR A

FIFTH COUNTERCLAIM

64.    Defendant repeats, reiterates, and realleges the foregoing as if fully set forth herein.

65.    In further consideration, Plaintiff agreed, *inter alia,* under Article 10.3 of the said

9

License Agreement, that any disputes arising under the Contract would be resolved by arbitration.

66.    The filing of this Declaratory Judgment action in United States District Court for the Southern District thereby constitutes a breach of the arbitration clause of the said Contract, since any dispute, including any dispute over the validity of the License Agreement contract, should have been filed in arbitration in New York.

67.    Defendant estimates that it will cost Fifteen Thousand ($15,000.00) Dollars in legal fees to defend against this Declaratory Judgment action, which would be otherwise necessary, and which would not need to be spent, had Plaintiff brought this dispute in the proper, and far more economical forum, of arbitration in New York.

68.    The failure of Plaintiff to bring this action in arbitration, and Plaintiff's act of filing this Declaratory Judgment action in U.S. District Court, constitutes breach of contract, and has damaged, or will damage, Defendant in the amount of Fifteen Thousand ($15,000.00) Dollars.

69.    Wherefore, Defendant demands reimbursement from Plaintiff for its losses on the Fifth Counterclaim for Breach of Contract in the amount of $15,000.00 Dollars.

## AS AND FOR A

## SIXTH COUNTERCLAIM

70.    Defendant repeats, reiterates, and realleges the foregoing as if fully set forth herein.

71.    In further consideration, Plaintiff agreed, *inter alia,* under Article 10.3 of the said License Agreement, that any disputes arising under the Contract would be resolved by arbitration.

72.    As stated in the Fifth Counterclaim, the filing of this Declaratory Judgment action in United States District Court for the Southern District thereby constitutes a breach of the arbitration clause of the said Contract, since any dispute, including any dispute over the validity of

the License Agreement contract, should have been filed in arbitration in New York.

73.    Defendant is therefore entitled to the equitable relief of a Declaratory Judgment from this Court dismissing Plaintiff's Declaratory Judgment action in its entirety; and issuing an Order in Defendant's favor validating the said License Agreement as an enforceable Contract, and confirming that Defendant's has the right to proceed immediately to arbitration against the Plaintiff for the sole purposes of adjudicating the said claims brought by Defendant against the Plaintiff and assessing said Defendant's damages.

74.    Wherefore, Defendant respectfully requests that this Court issue a Declaratory Judgement dismissing Plaintiff's action; validating the License Agreement of April 5, 2004 as an enforceable Contract; and confirming Defendant's right to proceed immediately to arbitration against Plaintiff to adjudicate Defendants claims against Plaintiff and assess Defendant's monetary damages.

WHEREFORE, Defendant Geometix International LLC respectfully demands Judgment dismissing Plaintiff Toy Play, LLC's Declaratory Judgment Action in its entirety, and validating the License Agreement of April 5, 2004 as an enforceable legal Contract made by and between the said parties thereto; and for a money Judgement in the amount of $105,000.00 on the First Counterclaim; $3,000,000.00 on the Second Counterclaim; $900,000.00 on the Third Counterclaim; $500,000.00 on the Fourth Counterclaim; $15,000.00 on the Fifth Counterclaim, for a total Judgment in the amount of Four Million, Five Hundred and Twenty Thousand ($4,520,000.00) Dollars, or, in the alternative, issuance of Declaratory Judgment on the Sixth Counterclaim deeming the License Agreement of April 5, 2004 between the parties a valid and enforceable contract, and confirming Defendant's right to proceed immediately to arbitration against Plaintiff to adjudicate Defendants

said claims against Plaintiff and assess Defendant's monetary damages; and for such other and

further relief which as to this Court may seem just and proper.


January 17, 2008                    Respectfully Submitted,

                                    /S/_____
                                    ROBERT PREVITO, ESQ. (RP6514)
                                    Attorney for Defendant Geometix International, LLC
                                    235 Brooksite Drive
                                    Hauppauge, New York 11788
                                    631-265-4494  f: 631-265-4382  *Rprevito@hotmail.com*


TO:     BRUCE EWING, ESQ.
        DORSEY & WHITNEY, LLP
        Attorneys for Toy Play, LLC.
        250 Park Avenue
        New York, New York 10177
        (212) 415-9200